# United States Court of Appeals
## For the First Circuit

No. 20-1018

UNITED STATES OF AMERICA,

Appellee,

v.

VALENTIN DELO PEREZ SOTO, a/k/a Miguel Martinez,
a/k/a Miguelin Valentine Sanchez, a/k/a Harold Gutierrez,
a/k/a Miguel Angel Sanchez Caraballo,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya McCafferty, U.S. District Judge]

Before

Kayatta, Lynch, and Howard,
Circuit Judges.

Paul M. Glickman, with whom Glickman LLC was on brief, for
appellant.
Seth R. Aframe, Assistant United States Attorney, with whom
John J. Farley, Acting United States Attorney, was on brief, for
appellee.

August 16, 2023

**HOWARD**, **Circuit Judge**.    Valentin Delo Perez Soto challenges his jury convictions for distribution of controlled substances (fentanyl and heroin) and possession of controlled substances with intent to distribute (heroin, cocaine, and oxycodone), arguing primarily that certain statements made by the prosecutor during the government's closing argument at trial were improper and deprived him of a fair trial.    He secondarily challenges the denial of his motion to suppress copious drug evidence obtained by law enforcement during a search, pursuant to warrant, of his apartment.    After careful consideration, we affirm.

## I. FACTS

The factual background is drawn from the district court's factual findings on Perez Soto's motion to suppress and from the undisputed record.

A New Hampshire state trooper, James O'Leary, who was assigned to a task force that investigated fraud relating to the New Hampshire Department of Motor Vehicles ("DMV"), testified at the suppression hearing as the government's primary witness.    In 2015, Trooper O'Leary received information from the DMV that the address of 138 Pearl Street, Apartment 402, in Manchester, New Hampshire ("Apartment 402") had been used for a fraudulent driver's license application for one "Miguel Sanchez."    When Trooper O'Leary ran a criminal records check, he identified an individual

associated with that name who had been convicted for passport fraud in federal district court in 1996. Nearly a decade later, in June 2015, "Miguel Sanchez" was again arrested, this time on prostitution-related charges. The booking photographs and fingerprints taken after the prostitution-related arrest were consistent with those of the 1996 passport fraud arrest. Those photographs were also consistent with the photograph for the fraudulent driver's license application that Trooper O'Leary received. "Miguel Sanchez" is none other than the defendant-appellant in this case, whose real name is Valentin Delo Perez Soto.

On October 28, 2015, Trooper O'Leary applied for a warrant to search Apartment 402 in connection with the suspected fraud. New Hampshire Circuit Court Judge Gerald J. Boyle found probable cause to believe that Apartment 402 contained evidence of the crimes of tampering with public records and of identity fraud. Judge Boyle issued a warrant (the "Boyle Warrant") authorizing the search of the Apartment. As the district court summarized in its order denying Perez Soto's motion to suppress:

> Attachment B of the Boyle Warrant permitted the officers to seize "[a]ll records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities" of the following categories of evidence: (1) evidence related to the production or counterfeiting of government documents; (2) legitimate government documents, such as passports,

driver's licenses, and Social Security cards; (3) records related to the acquisition of fraudulent government documents; (4) financial records; (5) cash or items of value made or derived from the production of government documents; (6) evidence related to the identity of any co-conspirators; (7) photographs; (8) personal electronic devices containing evidence related to identity fraud; (9) records related to the occupancy of Apartment 402; and (10) computer equipment and safes and locked containers, which may contain evidence of identity fraud.

On November 2, 2015, Trooper O'Leary, along with Sergeant Andrew Player (his supervisor), Trooper Shane Larkin, and New Hampshire Probation and Parole Officer Mark O'Donoghue,[1] entered Apartment 402 to execute the Boyle Warrant.

The officers found items that they believed were evidence of drug crimes, including a large number of cell phones, a scale, and wrapped bundles of cash amounting to $40,000. The

---

[1] Trooper Larkin (a member of the State Police Narcotics Unit and an FBI-coordinated Gang Task Force) and Officer O'Donoghue (a member of the Gang Task Force) had separately been investigating Perez Soto for drug-related activity unrelated to the identity fraud investigation; their investigation had involved a series of controlled buys of fentanyl and heroin. Both of them testified that they understood the scope of the search that day to be limited to documents. Trooper Larkin testified that the search, as explained to him, was for "documents, receipts, passports, any type of documentation relating to the identity of the individual they were trying to identify." Trooper Larkin and Officer O'Donoghue had initially connected with Trooper O'Leary when a deconflicting of addresses revealed that they were investigating Perez Soto's address and were therefore familiar with the area. Officer O'Donoghue participated in the search of Apartment 402 for only a short period of time, because he was called out for an unrelated matter from which he did not return, and he did not seize any items.

officers then stopped their search and applied for another warrant to search for evidence of drug crimes.

A different New Hampshire circuit court judge, Judge William Lyons, initially denied that application for lack of probable cause. The officers then continued their original search for evidence of identity fraud under the Boyle Warrant. Trooper Larkin, opening a kitchen cabinet next to the oven, saw that it was stuffed with a number of plastic shopping bags. Inside one of those bags, Trooper Larkin found a small box, which contained a substance that appeared to be heroin (55 fingers or 550 grams), along with cocaine, blue pills (containing oxycodone), and a small amount of marijuana.

The officers once again stopped their search and applied for a warrant to search for evidence of drug crimes, based on this new evidence, which Judge Lyons now granted (the "Lyons Warrant"). After resuming their search, the officers found additional evidence of drug crimes and identity fraud.

Perez Soto was federally indicted on three counts of drug distribution, based on one controlled buy of fentanyl and two controlled buys of heroin, and on one count of possession (of heroin, cocaine, and oxycodone) with intent to distribute, based on the drug evidence seized from his apartment. Perez Soto filed a motion to suppress all the drug evidence seized from his

apartment, arguing, inter alia, that the initial search was nothing more than an improper effort to search for drug evidence.

The district court denied the motion, holding that so long as the officers limited their search to areas where an individual could hide documents relating to identity fraud, as they did, it was immaterial whether the officers executing the search suspected that they might find drug evidence. The district court, considering the location of the box inside the plastic bag within the kitchen cabinet, concluded that the officers had properly limited their search to areas within the scope of the Boyle Warrant, and it denied Perez Soto's motion to suppress. This evidence was admitted at trial.

At trial, the prosecutor called as witnesses detective Jeffrey Harrington of the Manchester Police Department, Officer O'Donoghue, Sergeant Player, Trooper Larkin, and Trooper O'Leary. Detective Harrington testified that he was on a task force with the FBI that, in early 2015, began investigating the defendant for possible drug crimes. As part of the investigation, Harrington and an FBI agent instructed a confidential informant to purchase drugs from the defendant on three occasions. Harrington testified as to the procedures for each controlled buy and described how the informant successfully purchased fentanyl and heroin from the defendant. Officer O'Donoghue's testimony focused on his role as the confidential informant's parole officer. Officers Player,

Larkin, and O'Leary testified as to the search of the defendant's apartment, where they found $40,000 in cash, multiple scales and cell phones, and drugs (mainly, 55 fingers of fentanyl) inside the box in the kitchen cabinet, as well as identification documents. The government also called Anna Weaver, criminalist at the New Hampshire forensic lab's drug chemistry unit, to testify about her testing of the drugs seized and their chain of custody.

The defense called as witnesses Jacinta Dion, the landlord of the defendant's apartment, and Bonnie Ives, correctional officer with the Hillsborough County Department of Corrections. Ms. Dion testified about the setup of the building and how tenants and visitors might be able to access the apartments. Ms. Ives testified regarding how inmates are searched when they enter the correctional facility where she works, and how some contraband might still get in despite those searches. The defense sought to draw a contrast with the less invasive searches that were performed on the confidential informant as part of the controlled buys, in support of the theory that the informant could have incriminated the defendant by hiding contraband.

In closing, the government summarized the evidence against Perez Soto and responded to the argument that the confidential informant might have "outsmarted" his law enforcement handlers and framed the defendant. The defense then argued that the beyond-a-reasonable-doubt standard was not met primarily

because the informant had motive and opportunity to hide drugs in his person so as to incriminate Perez Soto.

## II. ANALYSES

### A. Plain Error Review of Alleged Improper Closing Argument

Perez Soto's main argument is that his convictions should be set aside on the basis of what he alleges were five improper statements the prosecutor (who was not appellate counsel) made during closing argument at trial. We have vacated convictions based on improper closing arguments by prosecutors, most recently in United States v. Canty, 37 F.4th 775 (1st Cir. 2022). Because no objection was made to any of the five statements, plain error review applies. See United States v. Kasenge, 660 F.3d 537, 541 (1st Cir. 2011).

Perez Soto, then, must show that "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of [the] proceedings." Canty, 37 F.4th at 790 (quoting United States v. Solís-Vásquez, 10 F.4th 59, 64 (1st Cir. 2021)). The third prong requires defendants to "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." Rosales-Mireles v. United States, 138 S. Ct. 1897, 1904-05 (2018) (internal quotation marks omitted).

- 8 -

Even had the objection been preserved, where the argument is based on improper prosecutorial statements, "reversal would be necessary only if, in light of the entire record, the remarks in the prosecutor's closing argument have 'so poisoned the well that the trial's outcome was likely affected.'" Kasenge, 660 F.3d at 542 (quoting United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003)). This analysis involves, inter alia, "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant[]." Canty, 37 F.4th at 791; United States v. Nelson-Rodriguez, 319 F.3d 12, 38 (1st Cir. 2003).

Perez Soto argues that five statements were improper, both individually and in their collective impact. We set forth and label the statements in the order in which they were made. See, e.g., United States v. Glover, 558 F.3d 71, 76 (1st Cir. 2009). The first three statements occurred at the beginning of the government's closing argument, the fourth occurred in the middle, and the fifth occurred at the end.

- "Miguel Sanchez was a high-volume seller of dangerous drugs in New Hampshire's biggest city." ("Statement One")

- "Today, more than two years later, is the defendant's day of reckoning. It is time for justice and you, members of the jury, are the

ones in a position to administer it." ("Statement Two")

- "Ladies and gentlemen, while this is a very serious case, it's not a complicated case. The government has presented far more than enough evidence than you will need to find beyond a reasonable doubt that the defendant committed each of the crimes with which he is charged." ("Statement Three")

- "The defense attorney apparently wants you to believe that the CI, who he likes to call El Pollo, or Chicken Wing, and who he wants you to believe is a drug-addled roofer with virtually no money, masterminded this plot and outsmarted all of the highly trained FBI agents, state troopers, and other law enforcement officers working on each controlled buy and whose very job it was to prevent that from happening." ("Statement Four")

- "So in closing I just want to say, members of the jury, the police have done their duty by investigating and solving this crime. The Department of Justice has done its duty by bringing you the evidence that proves the defendant committed the crime. Now it's time for you to do your duty as jurors. Find the defendant guilty of the crime of distribution of controlled substances in Counts One, Two, and Three and possession of more than 100 grams of heroin with intent to distribute as charged in Count Four." ("Statement Five")

Perez Soto focuses on the final statement, Statement Five, arguing that it "egregiously violated [his] constitutional rights by telling the jury that the government had solved the crime, brought the defendant to justice, and now it was the jury's duty to convict." Perez Soto's argument as to Statement Five involves both a claim of improper vouching as well as a claim that

- 10 -

the prosecution improperly suggested to the jury that its duty was to convict. The first aspect of this argument is not serious; the second one is.

The improper vouching aspect is without merit. We have explained that "[i]mproper vouching encompasses statements by the prosecutor that 'place[] the prestige of [the prosecutor's] office behind the government's case.'" United States v. Vázquez-Larrauri, 778 F.3d 276, 283 (1st Cir. 2015) (quoting United States v. Perez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003)). The "precise line between improper vouching and permissible argument is a 'hazy one.'" Id. (quoting United States v. Vizcarrondo-Casanova, 763 F.3d 89, 96 (1st Cir. 2014)). We have identified certain forms of improper vouching, including "when the prosecutor tells the jury that the prosecutor takes personal responsibility or ownership of the case and thus directly places the government's credibility at issue," id. at 284, as well as "when the prosecutor imparts her personal belief in a witness's veracity or in the defendant's guilt," id. (quotations and alterations omitted). The prosecutor here did not place any personal imprimatur on the government's case or make any special assurance regarding its reliability. Although the prosecutor conveyed that the police and the Department of Justice had "done [their] duty," the statement was generic and abstract and did not in any clear way place the

prestige of the prosecutor's office behind the strength of this particular case.

We do find much more serious the portion of Statement Five urging the jurors to do "their duty" followed by the statement "find the defendant guilty".  In United States v. Young, 470 U.S. 1 (1985), the Supreme Court held that a prosecutor had improperly urged a jury to "do its job."  Id. at 18.  "[T]hat kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice."  Id.  However, the Court held that the misconduct did not constitute plain error warranting reversal.  Id. at 20.  In United States v. Mandelbaum, 803 F.2d 42, 43 (1st Cir. 1986), we similarly did not reverse despite the prosecutor's saying during closing argument:

> I think, ladies and gentlemen, that when you finish examining all these materials, you will be able to find, I suggest to you, that there is ample evidence there for you to find beyond any reasonable doubt that [the defendant] did in fact commit the acts that the government charges her with.  And I would ask you, therefore, to do your duty and return a verdict of guilty.  Thank you.

We held in that case that, although the remark was improper, it did not lead to reversible error because (1) the comment was "isolated" and did not appear to be part of any "intentional effort to influence the jury in an improper way"; (2) "it was not flagrant in its effect"; (3) it was not contemporaneously objected to by

the defense; and (4) the government's evidence was strong in the case.  See id. at 45.

Our approach here is a bit different, as we cannot say that the prosecutor did not intentionally seek to cause the jurors to see their job as convicting.  We bypass the first two prongs of plain error review and address the third prong: whether defendant's substantial rights were affected.  Perez Soto has not shown that the statement likely affected the outcome of this case. The evidence against Perez Soto was very strong, as three controlled buys were conducted and substantial amounts of illegal drugs were seized from his apartment.  Any potential impact on the jury was lessened by the judge's instructing it that arguments and statements by the lawyers are not evidence.  And the suggestion that the jury should do its duty was made only in closing and did not reflect a theme sounded from the start of trial as in Canty. See Canty, 37 F.4th at 792 ("The emotional appeal to the jury to be other than finders of fact as to guilt was extensive, and was repeated at opening, closing, and at rebuttal.").  "There is no reason to believe that this isolated remark would affect the jurors in such a way that they would be unable to appraise the evidence in a fair and objective manner."  Mandelbaum, 803 F.2d at 45.

Statement Two was similarly flawed.  The prosecutor said that it was the "defendant's day of reckoning," that it was "time for justice," and that "you, members of the jury, are the ones in

a position to administer it."  In United States v. De La Paz-Rentas, 613 F.3d 18 (1st Cir. 2010), the prosecutor said to the jury, "Your chance today right now is to do justice, and justice is nothing more than on the highway there comes an intersection between the truth and the ability to do something about it."  Id. at 25.  We likened the prosecutor's language to the "do your duty" rhetoric, as it could be "used to convey the idea to the jury that their job is to convict."  Id. at 26.  Statement Two may plausibly be interpreted as making the same suggestion, and the government admits that the "propriety of this comment is at least questionable."  But, even in combination with Statement Five, it does not warrant vacating the conviction.  The evidence of guilt was strong, and Perez Soto has not shown that these improper statements led the jury to convict or influenced the conviction. See Young, 470 U.S. at 19-20.

Prosecutors are warned, though, not to adopt such rhetoric when addressing the jury, because jurors may feel pressured by the suggestion, coming from a place of authority, that their role in the process is not to act as independent arbiters but simply to rubber-stamp the government's exemplary work and therefore convict.  Such exhortations may ultimately lead to reversed convictions.  In this case, there is no indication that the prosecutor was a neophyte -- which underscores the need for this warning.

In Statement Four, the prosecutor responded to the defense counsel's attack on the confidential informant as the mastermind of a false accusation. The prosecutor argued that it would be absurd for its confidential informant to have masterminded a plot to incriminate Perez Soto that "outsmarted all of the highly trained FBI agents, state troopers, and other law enforcement." Perez Soto argues this constitutes improper vouching. Not so. The prosecutor referred to the officers' training, not to suggest that the jury should take their view of the case upon authority or belief, but, rather, to make the counterargument that their confidential informant could not plausibly have faked the controlled buys without their knowledge. That statement was a "'logical counter to the assertions of defense counsel' that the CI[] [was] not credible." United States v. Gentles, 619 F.3d 75, 85 (1st Cir. 2010) (quoting United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003)); see also id. at 84 ("[W]e tend to refrain from concluding that prosecutors improperly vouch for a witness when their remarks are made in an attempt to counter harmful allegations by the defense.").

In Statement Three, the prosecutor said that the "government has presented far more than enough evidence than you will need to find beyond a reasonable doubt that the defendant committed each of the crimes with which he is charged." There was nothing improper in this statement. See Mandelbaum, 803 F.2d at

43.  "[T]he prosecutor may suggest what the jury should find from the evidence before it." United States v. Sosa, 777 F.3d 1279, 1297 (11th Cir. 2015) (quoting United States v. Bernal-Benitez, 594 F.3d 1303, 1315 (11th Cir. 2010)).

Finally, Statement One, in which the prosecutor said that "Miguel Sanchez was a high-volume seller of dangerous drugs in New Hampshire's biggest city," was also not improper.  Perez Soto argues that there was no testimony that he was a "high-volume seller of dangerous drugs," nor that Manchester was "New Hampshire's biggest city."  Quoting Arrieta-Aggresot v. United States, 3 F.3d 525, 527 (1st Cir. 1993), he argues that the statement "only serve[d] to inflame the passions and prejudices of the jury and interject issues beyond the guilt or innocence of the accused."  The statement suggested to the jury, Perez Soto posits, that it had to convict him to protect the residents of the largest city in New Hampshire.

"It is a truism that prosecutors cannot refer to facts not in evidence.  But they can 'ask jurors to draw reasonable inferences from the evidence.'" United States v. Ponzo, 853 F.3d 558, 583 (1st Cir. 2017) (internal citation omitted) (quoting United States v. Meadows, 571 F.3d 131, 145 (1st Cir. 2009)).  That Perez Soto was a high-volume seller could be inferred, without much difficulty, from the physical evidence presented: in a single

kitchen cabinet, he had stashed away $40,000 in cash and 55 fingers (550 grams) of heroin, among other evidence.

As to the statement about Manchester, even though that particular fact was not in evidence, it is difficult to see how the statement prejudiced Perez Soto, as opposed to simply referring to Manchester by its name or generically as a city in New Hampshire. Putting aside the fact that the statement is true, whether or not Manchester was at the time the largest city in New Hampshire appears largely inconsequential when placed in the context of the closing argument as a whole or in the context of the overall case against Perez Soto.

## B. Denial of the Motion to Suppress

As to the denial of a motion to suppress, we review "findings of fact for clear error and conclusions of law, including whether a particular set of facts constitutes probable cause, de novo." United States v. Belton, 520 F.3d 80, 82 (1st Cir. 2008). "To prevail, [the appellant] must show that no reasonable view of the evidence supports the denial of the motion to suppress." Id.

"In determining whether it is reasonable to search a particular container for an object, 'search warrants and affidavits should be considered in a commonsense manner, and hypertechnical readings should be avoided.'" United States v. Rogers, 521 F.3d 5, 10 (1st Cir. 2008) (quoting United States v. Bonner, 808 F.2d 864, 868 (1st Cir. 1986)). "[A]ny container

- 17 -

situated within residential premises which are the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant." Id. at 9-10 (quoting United States v. Gray, 814 F.2d 49, 51 (1st Cir. 1987)).

We have also recognized, "[a]s to document searches especially, the easily concealed nature of the evidence means that quite broad searches are permitted." United States v. Giannetta, 909 F.2d 571, 577 (1st Cir. 1990). When executing a warrant to search for documentary evidence, the officers may "search anywhere such documents could be hidden, which would include pockets in clothing, boxes, file cabinets and files." Id.

And indeed, over 30 years ago, the Supreme Court in Horton v. California, 496 U.S. 128 (1990), held that "[t]he fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." Id. at 138; see also United States v. Ribeiro, 397 F.3d 43, 52-53 (1st Cir. 2005) (referencing Horton in denying a motion to suppress drug evidence seized during a document search).

Perez Soto argues two points to us: that the search was not lawful because it was "so clearly pretextual, occurring after the law enforcement had already completed the three drug buys with

the confidential information"; and that it was "improper for law enforcement to continue their search for drugs after the state court had explicitly rejected their application for a search warrant to search for drug evidence."

The "pretext" argument fails under the law we have just cited. In Ribeiro, we rejected a similar argument, that the documentary search warrant there was "a mere pretense because the police intended to search for drugs from the outset." 397 F.3d at 52. We held that "as long as the search was within the scope of the warrant, it is no matter that the officers may have hoped to find drugs." Id. Perez Soto does not argue that the Boyle Warrant lacked probable cause. Kitchen cabinets, plastic storage bags, and the box found inside one of them were all places where evidence of identity fraud, sought under the warrant, was likely to be hidden. A commonsense reading of the warrant indicates that it was appropriate to search those containers, see Rogers, 521 F.3d at 9-10, and Perez Soto cites no case law that militates against this result. Otherwise, fraudsters could insulate the evidence of their fraud from any search merely by storing that evidence in bags and boxes placed in kitchen cabinets.

It does defendant-appellant no good to argue that two of the law enforcement officers who helped search the apartment for evidence of identity fraud had participated in controlled drug buys as part of their drug-related investigation of him. The

investigation into identity fraud, led by Trooper O'Leary, had proceeded independently from the controlled-substances investigation, and there was ample probable cause to support the issuance of the Boyle warrant, authorizing a search for documents, without any reference to that other investigation. Indeed, the catalyst for the identity-fraud investigation was the DMV, not law enforcement. As explained in United States v. Ewain, 88 F.3d 689, 695 (9th Cir. 1996), "[n]ow that Horton has eliminated the 'inadvertent' discovery limitation . . . it no longer matters that the invited-along officer was looking for what he found, which thing was not described in the warrant. What matters is whether the officers looked in places or in ways not permitted by the warrant."

For the same reason, we reject the argument that it was improper for law enforcement to continue their search after Judge Lyons had rejected their first application for a search warrant to search for drugs. The record is clear that the officers kept their search within the parameters of the Boyle Warrant. We affirm the denial of Perez Soto's motion to suppress.

Affirmed.